Columbus Life Ins. Co. v. Wells Fargo Bank, N.A., 2022 NCBC 22.

STATE OF NORTH CAROLINA

COUNTY OF PITT

COLUMBUS LIFE INSURANCE COMPANY,

Plaintiff,

v.

WELLS FARGO BANK, N.A., as Securities Intermediary,

Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 0052

**ORDER AND OPINION ON DEFENDANT'S MOTION FOR LEAVE TO AMEND ANSWER, DEFENSES AND COUNTERCLAIMS**

THIS MATTER is before the Court on Defendant Wells Fargo Bank, N.A., as Securities Intermediary's ("Defendant" or "Wells Fargo") Motion for Leave to Amend Answer, Defenses and Counterclaims. ("Motion to Amend" or "Motion," ECF No. 64.)

THE COURT, having considered the Motion, the parties' briefs, the arguments of counsel, and other appropriate matters of record, CONCLUDES that the Motion should be GRANTED for the reasons set forth below.

*Cozen O'Connor, by Tracy L. Eggleston, Michael J. Broadbent, Philip J. Farinella, and Isaac A. Binkovitz, for Plaintiff Columbus Life Insurance Company.*

*K&L Gates LLP, by Zachary S. Buckheit, Matthew T. Houston, and A. Lee Hogewood III, and Schulte Roth & Zabel, LLP, by Harry S. Davis and Robert E. Griffin, for Defendant Wells Fargo Bank, N.A., as Securities Intermediary.*

Davis, Judge.

## FACTUAL AND PROCEDURAL BACKGROUND

1.      A detailed factual background of this case, as drawn from the Complaint (ECF No. 3), is contained in this Court's 2 September 2021 Order and Opinion on Defendants' Motions to Dismiss. (ECF No. 45; s*ee Columbus Life Ins. Co. v. Wells Fargo Bank*, 2021 NCBC LEXIS 73, at **2–7 (N.C. Super. Ct. Sept. 2, 2021).)

2.      Plaintiff Columbus Life Insurance Company ("Columbus Life") filed a Complaint in this matter on 7 January 2021 challenging the validity of a $2 million life insurance policy (the "Policy") issued to Gordon Earl Trevathan, Jr. ("Dr. Trevathan"). Columbus Life alleged that the Policy is the product of an illegal stranger-originated life insurance ("STOLI") scheme in which the initial premiums were paid by way of a non-recourse premium finance loan.[1] (ECF No. 3, at ¶¶ 13–15, 30.) In its Complaint, Columbus Life asserted claims seeking two related declaratory judgments: (1) that the Policy is an illegal wagering contract on a human life; and (2) that the policy was void *ab initio* for lack of an insurable interest. (ECF No. 3, at ¶¶ 36–45.)

3.      On 29 September 2021, Wells Fargo filed an answer containing one counterclaim against Columbus Life for "Return of Premiums" under "theories of

---

[1] Under a STOLI scheme using "non-recourse premium financing," a STOLI promoter "pay[s] all of the premiums of the policy—at no cost to the insured and with no risk to the insured— for the first two years of coverage, which was meant to coincide with the typical two-year contestability provision in a life insurance contract." (ECF No. 3, at ¶ 14.) "In turn, the STOLI promoter receives an immediate collateral assignment of the policy. At the end of the two-year period, the insured can simply walk away from the transaction by 'relinquishing' the policy to the STOLI promoter, or sell the policy to a different STOLI investor." (*Id.* at ¶ 15.) "[T]he initial intent of such transactions is to create policies that are not needed to protect the insured or their family or for any legitimate life insurance purpose, but instead are used as a wagering device so that strangers can gamble on the insured's life." (*Id.*)

unjust enrichment, quantum meruit, and/or restitution." (ECF No 53, at pp. 16–18.) The facts as alleged in the Counterclaim are set forth below.

4. On or around 11 February 2005, Dr. Trevathan applied for a $2 million life insurance policy with Columbus Life, listing himself as the owner and his estate as the beneficiary. (*Id*. at ¶ 7.) Subsequently, on 9 March 2005, Columbus Life issued the Policy to Dr. Trevathan. (*Id*. at ¶ 9.) From the Policy's issuance until 22 June 2007, Dr. Trevathan was the owner of the Policy, and his estate was the beneficiary. (*Id*. at ¶ 10.)

5. Shortly after the Policy's issuance, on or around 29 March 2005, Dr. Trevathan completed a Columbus Life "Assignment of Policy" form in which he assigned and transferred his rights, title, and interest in the Policy—"except any Dividends which are to be deducted from Premiums, and any Benefits arising from Total and Permanent Disability of the Insured"—to an entity called E&W, LLC ("E&W"). (*Id*. at ¶¶ 12–13.) In the same Assignment of Policy Form, Dr. Trevathan checked the box indicating that this was a "collateral assignment" of the Policy to E&W.[2] (*Id*. at ¶¶ 14–15.) On or around 17 May 2005, Columbus Life "executed the Assignment of Policy form that had been completed by Dr. Trevathan, and, in doing so, acknowledged the filing of the assignment." (*Id*. at ¶ 16.) On or around the same date, Columbus Life wrote to E&W that the collateral assignment of the Policy to E&W "ha[d] been recorded[.]" (*Id*. at ¶ 17.)

---

[2] A "collateral assignment" is "[a]n assignment of property as collateral security for a loan." *Collateral assignment*, BLACK'S LAW DICTIONARY (10th ed. 2014).

6.     Roughly two years later, on or about 8 February 2007, E&W released its assignment of the Policy, executing a release form that "stated 'RELEASE,' and 'FOR VALUE RECEIVED, the above Assignment is Released and Cancelled.' " (*Id.* at ¶ 19.) On or about 12 February 2007, the release form was "received and filed at the home office of Columbus Life[.]" (*Id.* at ¶ 20.) Around this same time, Columbus Life wrote to E&W that its records had been "documented to indicate that the assignment to E&W [ ] ha[d] been released." (*Id.* at ¶ 21.)

7.     A few months later, on or around 7 June 2007, Dr. Trevathan sold the Policy to Lifetrust, LLC ("Lifetrust") for the sum of $440,000 pursuant to a "Purchase and Sale Agreement." (*Id.* at ¶ 23.) The Purchase and Sale Agreement included certain items for Dr. Trevathan's completion—one being a "Premium Financing Disclosure" form on which Dr. Trevathan checked the box that stated the Policy "is not a Premium Financed Policy." (*Id.* at ¶¶ 25–27.)

8.     On or around 18 June 2007, Columbus Life "received a letter from B. Joseph Kashou—[the individual] who [ ] signed the Purchase and Sale Agreement on behalf of Lifetrust—enclosing Change of Ownership and Beneficiary Change forms" that sought to change the owner and beneficiary of the Policy to the entity Church Street Nominees Limited ("Church Street"). (*Id.* at ¶ 28.) On or around 22 June 2007, Columbus Life sent Church Street a letter that stated: "We received your recent request to change the ownership and beneficiary on the [Policy]. The changes have been recorded." (*Id.* at ¶ 29.)

9. Roughly five years later, the owner and beneficiary of the Policy was changed yet again. On or around 11 June 2012, Columbus Life received a fax from Wells Fargo "enclosing Change of Policy Owner and Change of Beneficiary forms on the Policy, which sought to change the owner and beneficiary of the Policy to [Wells Fargo]" as securities intermediary. (*Id.* at ¶ 31.) On or around 15 June 2012, Columbus Life sent letters to Church Street and Wells Fargo "confirming that the change of beneficiary on the Policy had been recorded and that the new beneficiary was [Wells Fargo]." (*Id.* at ¶ 32.)

10. Defendant Wells Fargo alleges that—from the date of the Policy's inception— Columbus Life provided the Policy's owners with: (a) "numerous In-Force Policy Illustrations" which detailed, among other things, the amount of premium payments that would be necessary to keep the Policy "in force"; (b) "numerous Verifications of Coverage on the Policy" representing that the Policy was "Active" or "Premium Paying"[3]; and (c) "Annual Reports" on the Policy. (*Id.* at ¶¶ 38, 40, 42.)

11. Defendant asserts that Columbus Life has never disclosed in its In-Force Policy Illustrations, Verifications of Coverage, or Annual Reports that Columbus Life "believed the Policy was void *ab initio* because Dr. Trevathan had paid premiums using a non-recourse [premium finance] loan (or otherwise)." (*Id.* at ¶¶ 37, 39, 41, 43.) Further, Defendant alleges that Columbus Life "knew Dr. Trevathan had used a non-recourse [premium finance] loan from E&W to pay premiums on the

---

[3] Defendant alleges that it reviewed these Verifications of Coverage prior to its purchase of the Policy in June 2012. (*Id.* at ¶¶ 34–36.)

Policy" and that "Dr. Trevathan had assigned the Policy as collateral to E&W" in May 2005, yet Columbus Life continued to issue In-Force Policy Illustrations, Verifications of Coverage, and Annual Reports on the Policy. (*Id.* at ¶¶ 56–57.)

12.     In addition, Defendant states that "[a]ll premiums due on the Policy from inception of the Policy through today have been duly and timely paid to Columbus Life," totaling $2,263,115 as of 28 September 2021. (*Id.* at ¶¶ 44–45.)

13.     Accordingly, Defendant contends in its counterclaim that, "[s]hould the Policy be held to be void, which [Defendant] denies, [Defendant] . . . is entitled to the return of all premiums ever paid on the Policy to Columbus Life, plus interest." (*Id.* at ¶ 47.)

14.     On 28 January 2022, Defendant filed the present Motion (ECF No. 64), seeking leave from the Court to amend its counterclaim "to add additional factual allegations and a counterclaim for fraud" based on "recently discovered information" from Columbus Life's 14 December 2021 document production during discovery. (ECF No. 66, at pp. 3, 5.)[4]  In conjunction with its motion, Defendant submitted a Proposed Amended Answer, Defenses and Counterclaims (ECF No. 65.1) along with a redlined version for the Court's review (ECF No. 65.2).

15.     A hearing on the Motion to Amend was held on 28 April 2022. The Motion is now ripe for resolution.

---

[4] In the Case Management Order entered by this Court on 30 September 2021, this Court set a deadline for the amendment of pleadings of 1 November 2021. (ECF No. 54, at p. 9.)

## LEGAL STANDARD

16.    Rule 15 of the North Carolina Rules of Civil Procedure states, in pertinent part, as follows:

> A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not yet been placed upon the trial calendar, he may so amend it at any time within 30 days after it is served.  Otherwise, a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. . . .

N.C.G.S. § 1A-1, Rule 15(a).

17.    Our Supreme Court has held that "[t]here is no more liberal canon in the rules than that leave to amend shall be freely given when justice so requires." *Vaughan v. Mashburn*, 371 N.C. 428, 434 (2018) (cleaned up).  "This liberal amendment process under Rule 15 complements the concept of notice pleading embodied in Rule 8 and reflects the legislature's intent that decisions be had on the merits and not avoided on the basis of mere technicalities." *Id.* (cleaned up).

18.    Nevertheless, "the [R]ules still provide some protection for parties who may be prejudiced by liberal amendment." *Henry v. Deen*, 310 N.C. 75, 82 (1984). "[R]easons for justifying denial of an amendment include: (1) undue delay, (2) bad faith, (3) undue prejudice, (4) futility of amendment, and (5) repeated failure to cure defects by previous amendments." *Howard v. IOMAXIS, LLC*, 2021 NCBC LEXIS 116, at *17 (N.C. Super. Ct. Dec. 22, 2021) (citations omitted).  Motions to amend are "addressed to the discretion of the trial court." *Vaughan*, 371 N.C. at 433 (citation omitted).

## ANALYSIS

19. Defendant seeks leave to amend its counterclaim based on information "recently discovered" during the parties' exchange of documents on 14 December 2021. (ECF No. 66, at pp. 3, 5.) Although Defendant also seeks to add various new allegations to its existing counterclaim, the most legally significant aspect of Defendant's motion is its attempt to add a counterclaim for fraud (the "Fraud Counterclaim") along with an accompanying request for punitive damages. (*Id*. at pp. 24–33.) In the proposed Fraud Counterclaim, Defendant asserts—in essence—that Columbus Life fraudulently (1) concealed from Defendant its suspicions that the Policy was an unlawful STOLI policy; and (2) misrepresented the fact that it had decided not to honor its obligations under the Policy upon Dr. Trevathan's death. Columbus Life opposes the Motion on various grounds, each of which is discussed below.

### i. *Undue Delay, Bad Faith, and Prejudice*

20. Defendant argues it did not engage in undue delay in the filing of the Motion because it was filed "approximately one month after Columbus [Life] produced documents that are the impetus for the [p]roposed [a]mendment" which "reveal[ed] for the first time that Columbus [Life] has been laser-focused on STOLI policies since 2005, with a particular focus on the use of non-recourse loans to finance premium payments, and has been treating the Policy internally as a STOLI policy since 2012, at the latest." (ECF No. 66, at p. 8.) Further, Defendant contends that because the Motion "seeks leave to assert a fraud counterclaim based on documents [Defendant]

received from Columbus [Life] in discovery approximately one month ago," the Motion is not being brought in bad faith. (*Id*. at p. 9.)

21.    In response, Columbus Life argues that Defendant had "already alleged enough facts and there was plenty of well-known industry context for Defendant to attempt their fraud claim . . . when [it] filed [its] original Answer[.]" (ECF No. 76, at p. 10.)  In addition, Columbus Life contends that "the insignificance of the cited newly discovered evidence only supports the conclusion that Defendant has asserted it as a bad faith pretext to add a cause of action after the deadline to further delay this litigation." (*Id*. at p. 13.)

22.    "In deciding if there was undue delay, the trial court may consider the relative timing of the proposed amendment in relation to the progress of the lawsuit" and  "may appropriately deny a motion for leave to amend on the basis of undue delay where a party seeks to amend its pleading after a significant period of time has passed since filing the pleading and where the record or party offers no explanation for the delay." *Zagaroli v. Neill*, 2017 NCBC LEXIS 103, at \*36 (N.C. Super. Ct. Nov. 7, 2017) (citations omitted).  This Court has noted that "[b]ad faith amendments are those which may be abusive or made in order to secure some ulterior tactical advantage." *Viataform, Inc. v. Aeroflow, Inc.* 2021 NCBC LEXIS 79, at \*\*16 (N.C. Super. Ct. Sept. 16, 2021) (cleaned up).

23.    First, the Court is not persuaded that under these circumstances Defendant's decision to wait until it had obtained relevant documents in discovery before asserting a counterclaim for fraud amounts to undue delay.  It is true that

Defendant alleged in its original Answer and counterclaim facts concerning Columbus Life's awareness of Dr. Trevathan's use of non-recourse premium financing to pay premiums on the Policy and that Columbus Life believed the Policy was void *ab initio* as a result. (ECF No. 53, at ¶¶ 12–18, 41.) Nevertheless, the Fraud Counterclaim sets forth a number of *new* (and more specific) allegations relating to Columbus Life's awareness as early as 2005 of STOLI policies utilizing non-recourse premium financing, Columbus Life's internal communications regarding STOLI policies, Columbus Life's flagging of the Policy as a potential STOLI policy as early as 2012, and Columbus Life's consistent representations that the Policy was "active" in its communications to policy owners—facts that were not alleged in Defendant's original counterclaim and that Defendant claims it obtained only recently through discovery. (*See* ECF No. 65.1, at ¶¶ 52–66, 85–117.)

24. For example, in its proposed Fraud Counterclaim, Defendant alleges the following:

> In May 2005, Columbus Life circulated a memo to Columbus Life producers regarding the company's policies on STOLI, which generally provided that Columbus Life would not be accepting applications for policies in which the insured would use non-recourse premium finance to pay premiums.

(*Id*. at ¶ 53.)

> Beginning in January 2012, Columbus Life circulated internal emails reflecting that it was tracking "potential investor owned/life settlement policies" or "potential life settlements," which included attachments that flagged the Policy.

(*Id*. at ¶ 55.)

> [O]n April 28, 2020, Columbus Life had the following exchange with a service provider for [Defendant's] customer on a recorded telephone call:
>
> Service Provider: "So you can confirm the Policy is Active."
>
> Columbus Life: "Correct"
>
> Service Provider: "And what does Active mean for you guys, exactly?"
>
> Columbus Life: "They would pay a death benefit."
>
> Service Provider: "They would get paid a death benefit?"
>
> Columbus Life: "Correct"

(*Id.* at ¶ 65.)

25. Second, the time sequence here—*i.e.*, the one-month delay in filing the Motion to Amend based on newly discovered evidence—stands in stark contrast to cases in which North Carolina courts have found undue delay in the Rule 15 context. *See, e.g., Wilkerson v. Duke Univ.*, 229 N.C. App. 670, 679 (2013) (holding that trial court did not abuse its discretion in denying plaintiff's motion to amend for undue delay where motion was filed *thirteen months* after initial complaint); *Zagaroli*, 2017 NCBC LEXIS 103, at \*37 (denying motion to amend *one year and three months* after filing of first amended complaint); *Carmayer, LLC v. Koury Aviation, Inc.*, 2017 NCBC LEXIS 82, at \*21 (N.C. Super. Ct. Sept. 11, 2017) (denying motion to amend after delay of seventeen months).

26. Third, the Court disagrees with Columbus Life's characterization of the Motion as a bad faith "delay tactic." The Court has already found that Defendant did not unduly delay the filing of the Motion. Moreover, Columbus Life has failed to offer any compelling argument that the Motion is "driven by an improper motive or

purpose, is abusive, or is otherwise offered in bad faith." *Vitaform,* 2021 NCBC LEXIS 79, at **15 (finding that motion to amend complaint based on information gained in "deposition admissions and a sworn affidavit" two months earlier was not made in bad faith).

27. Finally, Columbus Life has failed to show that it would be prejudiced by the granting of Defendant's Motion. Given the allegations in both the Complaint and Defendant's existing counterclaim, the circumstances leading up to Columbus Life's decision to seek a cancellation of the Policy were always going to be a major topic of discovery. Columbus Life has not put forth any valid argument that the scope of discovery will be unduly broadened by the granting of Defendant's Motion.

28. For these reasons, the Court concludes that Defendant's Motion is not the product of undue delay or bad faith and that Columbus Life has failed to show undue prejudice that would exist if the Motion is granted.

ii. *Futility*

29. The standard for assessing futility "under Rule 15 is essentially the same standard used in reviewing a motion to dismiss under Rule 12(b)(6), but provides the Court liberal discretion to find that an amendment lacks futility." *Simply the Best Movers, LLC v. Marrins' Moving Sys.*, 2016 NCBC LEXIS 28, at **5–6 (N.C. Super. Ct. Apr. 6, 2016) (citation omitted). "It is well-established that dismissal pursuant to Rule 12(b)(6) is proper when (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses

some fact that necessarily defeats the plaintiff's claim." *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (cleaned up).

30. Under North Carolina law, the five essential elements of a fraud claim are: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with the intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17 (1992).

31. Claims for fraud are subject to the heightened pleading standard set out in Rule 9(b), which requires that "[i]n all averments of fraud, duress or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." N.C.G.S. § 1A-1, Rule 9(b); *see Terry v. Terry*, 302 N.C. 77, 84 (1981) ("[A]llegations of fraud must be pleaded with greater particularity[.]"). Our Supreme Court has stated that

> [t]he purpose of this rule is to protect a defendant from unjustified injury to his reputation by requiring more particularity than is normally required by notice pleading, because fraud embraces such a wide variety of potential conduct that the defendant needs particularity of allegation in order to meet the charges.

*Terry*, 302 N.C. at 85.

32. Here, the theory underlying Defendant's proposed Fraud Counterclaim is that Columbus Life suspected that the Policy was a potential STOLI policy years before it filed this lawsuit, yet took no action in order to maximize its ability to continue collecting premiums—representing to the Policy's owners that the Policy

was "in force" and "active" while knowing full well that it would eventually seek to void the policy on STOLI grounds before having to pay out any death benefit.  (*See* ECF No. 65.1, at ¶¶ 84–117.)

33.     Columbus Life argues, however, that the proposed Fraud Counterclaim is futile because (1) Defendant has not alleged the claim with "greater particularity" as required under North Carolina law; (2) the alleged "misrepresentations" in the Annual Reports, In-Force Policy Illustrations, and Verifications of Coverage consist of nothing more than standard language contained in "form documents" that were "not intended to be definitively relied upon"; and (3) Columbus Life had no duty to disclose any of its suspicions that the Policy could be a STOLI policy prior to the filing of a lawsuit seeking the cancellation of the Policy.  (ECF No. 76, at pp. 14–25.)

34.     North Carolina courts have not previously had occasion to assess the legal sufficiency of a fraud claim against an insurer in this context.  Given the absence of on-point case law from North Carolina courts, it is appropriate to look for guidance from cases in other jurisdictions that have addressed this issue.  Although this Court is, of course, not bound by decisions from other jurisdictions in ruling on an issue of North Carolina law, it is permitted to consider such cases that it deems to be instructive.  *See Carolina Power & Light Co. v. Employment Sec. Comm'n of N.C.*, 363 N.C. 562, 569 (2009).

35.     In *PHL Variable Ins. Co. v. ESF QIF Trust*, the United States District Court for the District of Delaware addressed the validity of a fraud counterclaim alleging that an insurer "fraudulently and negligently misrepresented its intent by

not disclosing that it would challenge [the policy], all in an effort to induce [the owner of the policy] into paying millions of dollars in premiums." 2013 U.S. Dist. LEXIS 181268, at *21–22 (D. Del. Dec. 30, 2013). The court allowed the fraud counterclaims to survive the pleadings stage, finding that the plaintiff adequately alleged the elements of fraud and provided sufficient particularity by providing "the names of the agents who issued the policies subject to the fraud"; the existence of the policy on the insurer's "STOLI tracking spreadsheet" along with corroborating testimony from the insurer's employee; and "the policies, their face values, the premiums paid to date, and the premiums to be paid." *Id.* at *22–23.

36. Similarly, in *Columbus Life Ins. Co. v. Wilmington Trust Co.*, the Superior Court of Delaware refused to dismiss a fraud counterclaim against an insurer premised upon a similar theory. *See* 2021 Del. Super. LEXIS 139, at *2–4, *14–18 (Del. Sup. Ct. Feb. 15, 2021). The court concluded that

> Wilmington Trust has pled [a] fraud claim that survives the insurer's attempt at dismissal. Wilmington Trust pleads that Columbus Life investigated policies . . . including [the policy at issue], to determine whether they were stranger-oriented. Despite this investigation, Columbus Life chose not to cancel the policy. . . . . Wilmington Trust has provided details regarding the premiums that have been paid to date and attached portions of the annual reports that show Columbus Life's alleged misrepresentations regarding their intention to keep the policy in-force. Thereafter, Wilmington Trust relied on these representations by sending monthly premium payments to Columbus Life. Wilmington Trust has adequately pled this fraud claim[.]

*Id.* at *17–18.

37. Finally, in *U.S. Nat'l Ass'n v. PHL Variable Ins. Co.*, 2013 U.S. Dist. LEXIS 83744 (D. Minn. June 14, 2013), the United States District Court for the

District of Minnesota ruled that although the insurer's representations that the policy at issue was "in force," "issued," and had "value" were not sufficient to support a fraud claim based on affirmative misrepresentations, the fraud claim could proceed to the extent it was premised on a theory of fraudulent nondisclosure. *Id*. at \*26–33.

> [The plaintiff] alleges that the communications it received from [the insurer] were misleading because they led [plaintiff] to believe that [the insurer] intended to honor the [p]olicy when, in fact, [the insurer] believed the [p]olicy was void and intended to challenge it. . . . [The plaintiff] also alleges that [the insurer] had sole knowledge of its beliefs and intentions regarding the [p]olicy. . . .
>
> Assuming the truth of [the plaintiff's] allegations, the Court finds that they are sufficient to give rise to a duty to disclose. If [the insurer] in fact believed that the [p]olicy had not been validly issued and intended to challenge it as void, it would have been misleading for [the insurer] to repeatedly inform [the plaintiff] that the [p]olicy was in force and continue to collect premiums from [the plaintiff] without disclosing this information. Further, [the plaintiff] has sufficiently and plausibly alleged that [the insurer] had special knowledge of the material fact that [the insurer] believed the [p]olicy was invalid, and that [the plaintiff] did not have access to this information.

*Id*. at \*32–33.

38.     Based upon a careful review of the above referenced cases and thorough consideration of the parties' submissions and arguments, the Court does not believe that Columbus Life has shown that Defendant's Motion should be denied on the ground of futility.[5]

39.     As noted above, in addition to seeking leave to assert the Fraud Counterclaim, Defendant also requests that it be allowed to add certain specified allegations to its original counterclaim (*see* ECF No. 65.2, at ¶¶ 8, 13, 25, 43, 47–48,

---

[5] It remains to be seen, of course, whether Defendant will be able to offer sufficient evidence in support of its Fraud Counterclaim at the summary judgment stage.

51–66, 76, 78, and 80) that are likewise based largely on information obtained by Defendant in discovery. For the same reasons discussed above, the Court is satisfied that these amendments are also proper.

## CONCLUSION

THEREFORE, IT IS ORDERED that Defendant's Motion is **GRANTED**. Defendant shall file its Amended Answer, Defenses and Counterclaims on the Court's electronic docket within ten (10) days of this Order.

SO ORDERED, this the 3rd day of May, 2022.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge
for Complex Business Cases